UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| KYRA L. PARDUE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00332-LEW |
| | ) | |
| ANDREW RAYMOND, | ) | |
| THOMAS SAYRE, | ) | |
| CHRISTOPHER BROWN, | ) | |
| AMY GAGNE, TRAVIS BELLEARD | ) | |
| ERIC BILODEAU, ERIC SMALL, | ) | |
| & CRAIG ANDERSON, | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Kyra L. Pardue, proceeding pro se, advances constitutional and state claims against several Sanford Police Officers, the Chief of Police, and the Deputy Chief.  Before the Court is Defendants' Motion for Summary Judgment (ECF No. 87).  After review of the appropriate summary judgment materials, and for the following reasons, Defendants' Motion will be granted.

## BACKGROUND

A.    PROCEDURAL REQUIREMENTS OF SUMMARY JUDGMENT

Before the facts, some law on the facts.  Summary judgment is governed by both the Federal Rules of Civil Procedure and the District of Maine Local Rules.  This District imposed local rules on summary judgment filings so that judges "would not have to search the record to uncover factual disputes[,] becom[e] the lawyer for the unrepresented

plaintiff[,] or devot[e] an excessive portion of [its] time to such cases." *Clarke v. Blais*, 473 F.Supp.2d 124, 129 (1st Cir. 2007).   The Local Rules therefore provide that Defendants' "motion for summary judgment must be supported by a separate, short, and concise statement of material facts, each fact in a separately numbered paragraph [and] [e]ach fact asserted . . . must be supported by a record citation." D. Me. Loc. R. 56(b)(1). The rules also require that Ms. Pardue, as the opposing party, submit her own statement of material facts "limited to any additional facts." D. Me. Loc. R. 56(d). Her statement also "must admit, deny, or qualify the facts by reference to each numbered paragraph of the" Defendants' facts." *Id.*

Following these procedural rules is important.  I "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f).  And "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." *Id.*

Ms. Pardue's Response (ECF No. 92) largely fails to comply with the Local Rules. It begins, "Pursuant to Fed. R. Civ. P56(c)(1) and D. Me. Local Rule 56(b) Plaintiff Kyra Pardue submitted their statement of Disputed Material facts in support of my Objection to Summary Judgment."  Pl.'s Response at 1.  The Response contains no explicit admissions, denials, or qualifications.   The "Reasons for Objection" section does claim there is a "disputed fact" several times, but these disputes are either legal conclusions or do not reference Defendants' facts.  Occasionally, these disputes cite to Ms. Pardue's Supporting

Documentation (ECF No. 92-1). The supporting documentation itself is various photographs, letters, and unsworn, unnotarized "affidavits."[1]

In Defendants' Reply (ECF No. 100), they contend that their statement of material facts must be deemed admitted and Ms. Pardue's additional facts should be disregarded. Following Defendants' Reply, Ms. Pardue filed a Motion to Strike (ECF No. 101) her own summary judgment response and sought permission to file a new response. In a companion order, I denied Ms. Pardue's Motion to Strike. Being left with Ms. Pardue's original Response, I consider what, if any, of her facts and disputes are appropriate to consider at this stage.

I am mindful that Ms. Pardue is self-represented and apparently unfamiliar with procedural rules despite direction by the Court to make herself familiar with them. Where a self-represented party fails to comply with the summary judgment rules, "the obligations of the court . . . are not well defined." *Clarke v. Blais*, 473 F.Supp.2d 124, 128 (D. Me. 2007). The First Circuit has noted that an unrepresented plaintiff's summary judgment papers should be read "liberally." *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988). But wait, there's more. At the same time, it has "consistently held that a litigant's pro se status [does not] absolve him from compliance with [either] the Federal Rules of Civil Procedure [or] a district court's procedural rules." *F.D.I.C. v. Anchor Props.*, 13 F.3d 27, 31 (1st Cir. 1994) (cleaned up). The First Circuit has enforced

---

[1] As is, Ms. Pardue's papers likely do not meet the Federal Rules definition of an affidavit or declaration, which requires that affidavits or declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

the procedural rules against self-represented parties at least where they have "clear notice of the rule and the deficiencies of [their] response." *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980).

In this case, as with most cases in a court of law, even in the First Circuit, enforcement of the rules is appropriate. Multiple times this Court has requested Ms. Pardue read the Handout for Self-Represented (Pro Se) Parties after she misunderstood the procedural rules. *See* ECF Nos. 81, 83. That handout details motions for summary judgment and provides a link to Local Rule 56. Ms. Pardue's Response indicates some attempt to comply with the procedural rules—it even begins by citing them. It seems Ms. Pardue had notice of the rules surrounding summary judgment and failed to comply with them. I may then disregard her additional facts and deem Defendants' facts admitted. *See Marcello v. Maine*, 489 F.Supp.2d 70, 78 (D. Me. 2007) ("The Court concludes [plaintiffs] were on notice of the requirements contained in Local Rule 56(c), and their failure to comply with them must have consequences.").

Even if I were to pore over Ms. Pardue's filings to build a case for her and construe genuine disputes of material fact it seems that attempt would fail.[2] Nearly all Ms. Pardue's factual disputes are either immaterial and/or misconstrue Defendants' facts.[3] Likewise,

---

[2] I have the discretion to accept some or all of Ms. Pardue's procedurally defunct additional facts. *See* D. ME. LOC. R. 56(f) ("The Court *may* disregard any statement of fact not supported by a specific citation . . . .). But I have "no independent duty to search or consider any part of the record not specifically referenced in a statement of facts." *Id.* Even so, scrutinizing Mr. Pardue's papers to construe an argument abandons the judicial role.

[3] For example, Ms. Pardue states that the two officers who arrested her in her house entered seventeen feet into her house instead of three. First, Defendant's Statement of Material Facts only states Ms. Pardue was "two or three feet into the house" when she was told she was under arrest, not that the officers only went three feet into the house to arrest her. Second, for her claims of unlawful entry, and unlawful arrest, a

*(continued next page)*

4

Ms. Pardue's additional facts are simply legal conclusions, go well beyond her original complaint, and are unsupported by the record.[4]  As I explain in my companion order, this pattern suggests that any further "affidavits or responsive papers that [Ms. Pardue] would have filed would not have raised genuine issues of material fact and would not have altered" my below decision on summary judgment.  *Marcello*, 489 F.Supp.2d at 78-79 (quoting *United States v. Ninety-Three Firearms*, 330 F.3d 414, 428 (6th Cir. 2003)).

On top of that, much of the underlying summary judgment facts are captured on video.  Ms. Pardue contends that some of this video footage—recordings from officers' body-worn cameras—has been doctored.  She offers no admissible or relevant evidence to support this claim.  At most, she submits an "affidavit" of Stefaun Corrigan, that claims he was present while Ms. Pardue was in police custody and saw officers place Ms. Pardue in wooden boxes.  This "version of events is so utterly discredited by the record that no reasonable jury could have believed [them]."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Accordingly, I "view[] the facts in the light depicted by the videotape."  *Id.*  at 381.

I sympathize with Ms. Pardue's unfamiliarity with this Court's procedural rules.  But she has been afforded many opportunities to familiarize herself with the rules and

---

difference of fourteen feet does not matter.  Police were either entitled to enter Ms. Pardue's home and arrest her or they were not.  While I do not provide a laundry list of other alleged factual disputes, they are similarly unproductive.

[4] For instance, Ms. Pardue's Response states, "I guess we have to be half Black . . . to get protection from the Sanford Police Department cruisers."  Pl.'s Response at 4.  Even with the most generous reading, this ill-conceived disparate treatment claim is nowhere in Ms. Pardue's complaint.  And its only support in the record is an unsworn "affidavit" attributed to Ms. Pardue's minor son, which gives the same unfounded statement.  Pl.'s Supporting Doc. at 3.  "It is well settled that plaintiffs are generally not permitted to raise brand new theories of their case in opposition to a motion for summary judgment."  *Agri-Mark, Inc. v. Niro, Inc.* 233 F.Supp.2d 200, 207 (D. Mass. 2002) (collecting authority).

continually failed to carry her procedural burden. I will not carry it for her. Ms. Pardue is not "entitled to extra procedural swaddling." *Eagle Eye Fishing Corp. v. U.S. Dep't of Comm.*, 20 F.3d 503, 506 (1st Cir. 1994). Defendants' facts are deemed admitted and I draw the following background from their Statement of Material Facts (ECF No. 86). While I treat those facts as undisputed, I consider them in a light most favorable to Ms. Pardue[5] and draw reasonable inferences in her favor.

## B.    THE FACTS

Ms. Pardue has had numerous interactions with Sanford police. However, her present claims relate specifically to two separate incidents where she was arrested by Sanford police officers.

### 1.    2021 Arrest

In September 2021, Ms. Pardue's adult son, Tyler, called 911 to report that Ms. Pardue had hit him. Defendants Officer Raymond and Sergeant Sayre responded.[6] Both had responded to similar calls in the past and were familiar with Ms. Pardue and Tyler.

Officer Raymond arrived first and found Tyler outside. The two spoke and Tyler reported Ms. Pardue had punched him in the head. Tyler showed Officer Raymond where he had been hit, and Officer Raymond saw a raised lump in the spot. Sergeant Sayre arrived next and he, Tyler, and Officer Raymond approached Ms. Pardue's home. Officer Raymond stood on the porch and knocked on the door to no immediate response. While

---

[5] At least where the facts are not made clear from video evidence.

[6] At the time, neither Officer Raymond nor Sergeant Sayre had a body-worn camera. However, Tyler recorded part of the incident on his cellphone. Def.'s Ex. 2 (ECF No. 85-5). Officer Raymond also wore a portable microphone which picked up some audio of the altercation. Def.'s Ex. 1 (ECF No. 85-1).

the three waited, Tyler and Sergeant Sayre stood just off the porch. Tyler repeated his story and showed Sergeant Sayre his head injury. Eventually, Tyler's girlfriend, Desiree, answered the door and, upon request, went to get Ms. Pardue.

Ms. Pardue came to the doorway, whereupon she and Tyler got into it. Tyler tried to plead that he would not be charging Ms. Pardue with any crimes while Ms. Pardue screamed at Tyler for not respecting the rules of her house. Officer Raymond asked Ms. Pardue what her side of the story was. Ms. Pardue was not particularly forthcoming, and instead insisted Officer Raymond get off the porch. Officer Raymond attempted to get Ms. Pardue to step outside and away from Tyler by offering to step off the porch if she came outside and let Tyler inside to collect his things. Ms. Pardue repeated that she had nothing to say to the police and continued arguing with Tyler.

At this point, Officer Raymond decided to arrest Ms. Pardue for domestic violence assault. He made a hand signal to Sergeant Sayre indicating he was going to handcuff Ms. Pardue. Officer Raymond then asked Tyler to go inside and again asked Ms. Pardue to come outside. She refused and turned back into her house. After a few steps, Officer Raymond told Ms. Pardue she was under arrest and entered her house. Ms. Pardue retreated further into her home closely followed by Officer Raymond and Sergeant Sayre.

Both officers grabbed Ms. Pardue on either side. Officer Raymond attempted to cuff Ms. Pardue, but she attempted to pull away and fought having her arms placed behind her back. Then, Ms. Pardue's minor son and her three dogs got into the mix. The son tried tugging on Ms. Pardue's arm while the dogs bit Sergeant Sayre in the leg. By this time, Officer Raymond had finished handcuffing Ms. Pardue but he had not double locked the

7

handcuffs.  Double locked handcuffs will not move in either direction so they cannot tighten on an arrestee's arm.  Given the ongoing chaos, Officer Raymond decided to remove Ms. Pardue from the house before finishing her arrest.

The police forcibly led Ms. Pardue out of the house.  Officer Raymond finished double locking Ms. Pardue's handcuffs while Ms. Pardue complained that the cuffing and/or removal hurt.  The officers then placed Ms. Pardue in Officer Raymond's cruiser and she was taken to jail.

About eight months after her arrest, Ms. Pardue sent a misconduct complaint against Defendants Raymond and Sayre to Defendant Chief Andersen.  Chief Andersen assigned Defendant Deputy Chief Small to investigate Ms. Pardue's allegations.  Deputy Chief Small interviewed Officer Raymond, Sergeant Sayre, Ms. Pardue, Tyler, and Desiree.  He also watched a video of the arrest Tyler recorded on his phone.  He concluded "Ms. Pardue's allegations of unlawful arrest, excessive force, and assault against Officer Raymond and Sergeant Sayre were unfounded, and the unlawful entry allegation was not sustained."  Aff. of Eric Small (ECF No. 85-15) at ¶ 9.  In December 2022, Ms. Pardue filed a Notice of Claim with the Sanford Police department, as required by the Maine Tort Claims Act, alleging injury from her arrest.

### 2.    2023 Arrest

The second incident occurred when Tyler again called 911.  This time, Tyler reported that both Ms. Pardue and his younger sister had punched his girlfriend, Desiree.

Four Sanford police officers responded.[7]   Officer Jarrett (not named in this suit) and Defendant Officer Belleard were initially dispatched.  Defendants Officers Bilodeau and Gagne also went to the Pardue house believing multiple officers may be best.  All four officers had been dispatched to Ms. Pardue's home several times before in response to reports of domestic altercations.

Officers Jarrett and Belleard arrived within moments of each other.  Officer Jarrett approached Ms. Pardue, who was standing on her porch, to ask her what had happened. Ms. Pardue strongly and immediately demanded the officers leave her property.  This back and forth continued while Officers Bilodeau and Gagne arrived.  A few minutes after all of the officers arrived, Tyler left the house carrying his belongings.  Ms. Pardue followed Tyler insisting he get off her property too.  As Tyler walked down the road, Ms. Pardue knocked his belongings out of his hands.

Officer Belleard then got between Tyler and Ms. Pardue and ordered her to get back inside.  As she walked back toward the house, Ms. Pardue continued yelling at Tyler and Officer Belleard gave her a "disorderly conduct warning" and advised her to stop.  Defs' Ex. 3 (ECF No. 85-3) at 6:50-6:54.  As Ms. Pardue returned to the porch she turned and, with great aim, threw her drink at Officer Belleard. Immediately afterward, Desiree came to the front door carrying her belongings and joined Tyler outside the house.

Officer Belleard joined Tyler and Desiree.  Desiree told Officer Belleard that Ms. Pardue had hit her and that she recorded the incident on her phone.  Officer Belleard

---

[7] Three of the four officers had body-worn cameras that were on for their entire interaction with Ms. Pardue. *See* Def.'s Exs.  3-5 (ECF Nos. 85-3 to 85-5).

watched the video, which recorded Ms. Pardue slapping and pushing Desiree in her face.[8] Officer Belleard also saw marks on Desiree's face and neck. Based on this evidence, Officer Belleard decided to arrest Ms. Pardue for domestic violence assault.

Officer Belleard returned to the porch and tried to handcuff Ms. Pardue. Ms. Pardue refused to have her hands placed behind her back. Officer Belleard grabbed Ms. Pardue by the arm and Officer Bilodeau came to help. As Ms. Pardue had her phone in one hand, Officer Bilodeau offered to take the phone so it did not break. In turn, Ms. Pardue asked Officer Bilodeau to arrest Desiree and told him he was the only police officer that was listening to her. She then stated she wanted to go with Officer Bilodeau and told Officer Belleard to let her go.

Officer Belleard refused to let Ms. Pardue go and told her he needed to place her in handcuffs. As Ms. Pardue was adamant she did not want to go with Officer Belleard, he agreed that Officer Bilodeau could take her to jail but again insisted she cooperate with being handcuffed. Eventually, Ms. Pardue stepped off the porch and Officer Belleard handcuffed and double locked the handcuffs. Officer Belleard continued to hold Ms. Pardue's arm as he led her to Officer Bilodeau's cruiser. During the arrest, Officer Gagne attempted to calm down Ms. Pardue's minor daughter and son, who were arguing with the police, Tyler, and Desiree.

Officer Bilodeau took Ms. Pardue to the Sanford Police Department. Ms. Pardue complained that she was handcuffed too tightly. Officer Bilodeau briefly uncuffed Ms. Pardue so she could use the bathroom, then he handcuffed one of her hands and one of her

---

[8] Officer Belleard asked Desiree to send the video to his email, but she did not.

ankles to a bench.  As Officer Bilodeau filled out a summons, he gave Ms. Pardue his phone so she could arrange her bail bond.  He initially told her she would not be going to jail because he assumed she could pay her bail.  However, Ms. Pardue was not able to make any bail arrangement, so Officer Bilodeau told her he would have to take her to jail.[9]

Ms. Pardue became very upset and refused to sign her summons.  She also continually complained that she had been handcuffed too tightly and that Officer Belleard was too rough in arresting her.  Because of her repeated complaints, Officer Bilodeau decided to take Ms. Pardue to Southern Maine Health Care ("SMHC") for a "FIT" for incarceration evaluation.  He handcuffed (and double-locked) Ms. Pardue with her hands in front of her and led her back to his car.

During the drive, Ms. Pardue told Officer Bilodeau that the last time she had gone to SMHC she had been sexually assaulted in the lobby.  Due to that traumatic experience, she wished to go to a different hospital.  As SMHC is where all Sanford police bring arrestees for such evaluations, Officer Bilodeau could not take her elsewhere.  He did attempt to accommodate Ms. Pardue by driving her to the emergency room entrance to avoid the lobby.  Still, when she arrived, Ms. Pardue requested that she be permitted to speak to a mental health counselor because of her past experience.

Officer Bilodeau and two SMHC security guards walked with Ms. Pardue into the hospital without touching her.  Ms. Pardue walked into an exam room and Officer Bilodeau and the other security guards left to stand outside.  While he waited, a doctor approached

---

[9] This portion of Officer Bilodeau's body-worn camera footage lacks audio, as do later sections of footage. Nonetheless, I find Officer Bilodeau's affidavit to provide an accurate summary of what the video depicts.

Officer Bilodeau to get his story. He recounted the events leading to Ms. Pardue's arrest and warned the doctor that mentioning Tyler or Desiree during the FIT may make Ms. Pardue irate. Meanwhile, Ms. Pardue stated that she would hang herself if she was taken to jail. Both the doctor and Officer Bilodeau overheard this. The doctor, however, did not seem to take the threat seriously and told Officer Bilodeau that Ms. Pardue would be fit for jail after a ten-minute safety check.

Ms. Pardue was evaluated and deemed fit for incarceration. Officer Bilodeau went into her examination room to take her to jail. From her examination, Ms. Pardue had various wires attached to her. As Officer Bilodeau and SMHC security went to remove the wires, Ms. Pardue took off her shoe. Officer Bilodeau thought she might throw it at the officers. When Ms. Pardue refused to put her shoe down, Officer Bilodeau requested that a supervisor respond for assistance. Defendant Sergeant Brown responded.

While waiting for backup, Officer Bilodeau attempted to grab Ms. Pardue's shoes while SMHC security removed the wires. Ms. Pardue was less than cooperative, so Officer Bilodeau physically restrained her legs while the security guards and hospital staff attempted to remove the wires. While held down, Ms. Pardue spat on one of the security officers. In response, SMHC security held Ms. Pardue's head down while Officer Bilodeau requested a spit hood[10] from medical staff. Medical staff first placed Ms. Pardue in a surgical mask then, as SMHC security held her down, put her in a spit hood.

---

[10] A mesh head and face cover.

Officer Bilodeau then wheeled Ms. Pardue out of the hospital on a gurney given her ongoing resistance.  Outside, they were met by Sergeant Brown, who held down Ms. Pardue's legs so Officer Bilodeau could apply a transport belt.[11]  Officer Bilodeau and Sergeant Brown also attempted to place Ms. Pardue's legs in a hobble max device.[12]  But the two eventually determined the restraint would not be feasible.  Instead, Officer Bilodeau used a second set of handcuffs to attach Ms. Pardue's hands to the transport belt and walked her to his cruiser.  Officer Bilodeau and Sergeant Brown took her to jail intake along with the paperwork from her FIT evaluation.

About a week after this arrest, Ms. Pardue sent Chief Andersen a long letter accusing Defendants Bilodeau, Belleard, Brown, and Gagne of misconduct.  He again assigned Deputy Chief Small to investigate.  After reviewing the officer's body-worn camera footage and narrative reports, he again concluded Ms. Pardue's "allegations against the officers were unfounded."  Aff. of Eric Small ¶ 11.

Based on these two arrests, Ms. Pardue brings a litany of state and federal claims against the officers involved.  Ms. Pardue also seeks to hold then-Police Chief Craig Andersen and Deputy Chief Eric Small accountable on a theory of supervisory liability.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Disputes are genuine if they can be resolved in favor of either party,

---

[11] A strap to limit arm motion.

[12] A rope system used to restrain legs.

and facts are "material" if they have the potential to impact the outcome of the case. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). To raise a genuine issue of material fact, Ms. Pardue must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in her favor. *See Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999).

I view the facts in a light most favorable to Ms. Pardue and draw all reasonable inferences in her favor. Construing Ms. Pardue's complaint generously, she brings a Section 1983 action against the defendants, alleging constitutional violations stemming from her two arrests.[13] She also brings supervisory liability claims against Defendants Andersen and Small, as well as a smattering of state law claims against most defendants. I address each in turn.

## A.    CONSTITUTIONAL CLAIMS

### 1.    Unlawful Arrest

Ms. Pardue contends that both her 2021 and 2023 arrests were unlawful. She accuses Defendants Raymond, Sayre, and Belleard of violating her Fourth Amendment rights.

The Fourth Amendment protects the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. am. IV. A warrantless arrest is reasonable where there is probable cause to believe a crime has been committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause requires that the facts

---

[13] Although Ms. Pardue's complaint lists "Freedom of Expression" as a basis for this Court's jurisdiction, I do not read her complaint to bring a First Amendment claim. And even if it did, no reasonable finder of fact could conclude Ms. Pardue's free speech rights were infringed by her arrests.

known to the arresting officer are "sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997). Probable cause "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), and it is satisfied where there is merely "a probability or substantial chance" a crime has occurred. *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018). A victim's statement corroborated by their injuries easily creates probable cause. *Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972). But even an uncorroborated witness statement can support probable cause to arrest. *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004).

In 2021, Ms. Pardue was arrested for domestic violence assault. Maine law defines this as causing an assault (such as bodily injury or offensive contact) against a family or household member. 17-A M.R.S. §§ 207(1)(A), 207-A(1)(A). Her unlawful arrest claim can survive summary judgment if the facts show there was no probable cause to arrest her. But the relatively low bar of probable cause is met on these facts. Defendants Raymond and Sayre had more than enough facts to support an arrest for a domestic violence assault. Both were familiar with the Pardue family. They knew Tyler was Ms. Pardue's son and that he lived with her. Prior to Ms. Pardue's arrest, Tyler told both Officer Raymond and Sergeant Sayre that Ms. Pardue had hit him in the head. And, most saliently, Tyler's story was also corroborated by his own injury. *Nelson*, 470 F.2d at 1197. At this point, a reasonably prudent person could conclude that Tyler's corroborated story made it probable Ms. Pardue had assaulted her son. *Bizier*, 111 F.3d at 217.

15

Probable cause is also easily met for Ms. Pardue's 2023 arrest for domestic violence assault. Again, the arresting officer, Defendant Belleard, was given a victim statement corroborated by matching injuries. Officer Belleard was also shown a video showing Ms. Pardue slapping and pushing Desiree. Between Desiree's statements, injuries, and the video, it was sufficiently probable Ms. Pardue committed domestic violence assault. *Id.*

The facts, even viewed in a light most favorable to Ms. Pardue, show there was probable cause supporting both of her warrantless arrests. As such, neither of her arrests violated her Fourth Amendment rights.

### 2. Unlawful Entry

Ms. Pardue also alleges that the police unlawfully entered her house in 2021 and her driveway in 2023. She therefore accuses Defendants Sayre, Raymond, Gagne, Belleard, and Bilodeau of violating her Fourth Amendment rights.[14]

With respect to the 2021 arrest where officers entered Ms. Pardue's house, "[n]onconsensual entries by government agents into a residence without a search or arrest warrant are presumptively 'unreasonable' under the Fourth Amendment." *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 544 (1st Cir. 1996) (footnote omitted) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 (1984)). But the general warrant requirement rule has exceptions. One such exception is the presence of "exigent circumstances."

---

[14] Defendants suggest that Ms. Pardue does not bring an unlawful entry claim against Officer Bilodeau. Defs' Mot. at 22 n.6. Ms. Pardue's complaint states "violations continue to March 29, 2023 trespassed on my property." Compl. at 11. It goes on to detail that specifically Officers Gagne and Belleard did not leave Ms. Pardue's property when she asked them to. *Id.* at 11-12. Reading the complaint generously, I think Ms. Pardue brings an unlawful entry claim against all Defendants present for her 2023 arrest. But the defenses and the arguments Defendants Gagne and Belleard raise here are equally applicable to Officer Bilodeau.

16

Exigent circumstances are those that create "a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Almonte*, 952 F.2d 20, 22 (1991). *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). The best examples of exigent circumstances include: (1) "hot pursuit" of a felon into a residence; (2) imminent destruction of evidence inside the house, (3) a threat of potentially successful escape by a suspect inside the house, and (4) the imminent threat to the life or safety of the public, police, or a person within the house. *United States v. Rodriguez-Pacheco*, 948 F.3d 1, 7 (1st Cir. 2020); *McCabe*, 77 F.3d at 545.

Hot pursuit and imminent threat are most relevant here. Ms. Pardue was not a felony suspect, but that does not categorically exclude the exigent circumstance of hot pursuit. The more serious the crime underlying the arrest is, the more reasonable warrantless entry into the home may be. *See Welsh*, 466 U.S. at 750; *see also Lange v. California*, 594 U.S. 295, 305, 312-13 (2021) ("[A] felon is not always more dangerous than a misdemeanant." (internal quotations and citations omitted)). Although domestic violence assault is a misdemeanor in Maine, domestic disputes nonetheless have a "combustible nature" and courts give "great latitude to an officer's belief that warrantless entry was justified." *Tierney v. Davidson*, 133 F.3d 189, 197 (1st Cir. 1998); *see also Fletcher v. Town of Clinton*, 196 F.3d 41, 50 (1st Cir. 1999) ("In [domestic] disputes, violence may be lurking and explode with little warning . . . . The signs of danger may be masked.").

The undisputed facts of record depict exigent circumstances warranting entry into Ms. Pardue's house to arrest her in 2021. At the time of their entry, Defendants Sayre and Raymond had probable cause to believe Ms. Pardue had assaulted her son. Ms. Pardue had

17

not provided a separate story, but instead continued to yell at Tyler. The underlying threat of violence to Tyler, Tyler's girlfriend, and potentially Ms. Pardue's minor children remained. In such a volatile situation, there was a compelling need for Defendants Raymond and Sayre to dispense with the warrant requirement and pursue and arrest Ms. Pardue inside her house.

As to the 2023 arrest, no officers entered Ms. Pardue's house. Instead, they stood outside the house, in Ms. Pardue's driveway near her porch. The "curtilage" or area "immediately surrounding and associated with the home," is protected under the Fourth Amendment. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). But even accepting that Ms. Pardue's driveway was within the curtilage of her home,[15] Defendants Bilodeau, Gagne, and Belleard were entitled to enter and remain in the driveway.

"[P]olice officers have an implied license to approach the home through the curtilage and . . . request to speak to the occupant . . . ." *United States v. Mumme*, 985 F.3d 25, 39 (1st Cir. 2021). So, Defendants Bilodeau, Gagne, and Belleard were entitled by implied license to initially encroach on Ms. Pardue's property as part of their response to Tyler's 911 call. And although Ms. Pardue revoked that license, Defendants were still entitled to stay and investigate because exigent circumstances existed. Just as in the 2021 arrest, police had probable cause to believe Ms. Pardue had committed domestic violence assault, this time on Desiree. As they attempted to get Ms. Pardue's story, she continued to argue with Tyler and Desiree. As before, the undercurrent of violence created an exigent

---

[15] Defendants dispute this and not without merit. But I do not address their arguments because the undisputed facts depict exigent circumstances occasioned Ms. Pardue's 2023 arrest.

circumstance in the form of an imminent threat of violence to Tyler or Desiree, who stood at the edge of the yard, waiting for a ride.  Police then had a compelling reason to stay within the curtilage and not leave to seek a warrant because more domestic violence could have erupted.

Because exigent circumstances existed during both her 2021 and 2023 arrests, Ms. Pardue has failed to make out a constitutional violation of warrantless entry.

### 3.    Excessive Force

Ms. Pardue asserts a Fourth Amendment excessive force claim against (1) Defendants Sayre and Raymond for her 2021 arrest, (2) Defendant Belleard for her 2023 arrest, and (3) Defendants Bilodeau and Brown for restraining her during her FIT evaluation.  Ms. Pardue's Fourth Amendment right to be secure in her person applies while she is being arrested or detained.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  But her constitutional right does not wholly preempt the use of any force against her.  The Fourth Amendment instead limits the use of force to an "objective reasonable standard." *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 326 (1st Cir. 2015).  Ms. Pardue must "show not only that [the police] employed force . . . but also that that level of force was objectively unreasonable under the circumstances."  *Id.*  Determining reasonableness requires the finder of fact to look to the totality of the circumstances, including: (1) the severity of the crime at issue, (2) whether Ms. Pardue posed an immediate threat to the safety of the officers or others, and (3) whether she was actively resisting or attempting to evade arrest.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Given the undisputed circumstances surrounding Ms. Pardue's 2021 and 2023 arrests, the *Graham* factors would not permit the finder of fact to rule in her favor. On seriousness, domestic violence offenses fall toward the more severe side of misdemeanors given their powder-keg qualities. *Fletcher*, 196 F.3d at 50. The same goes for threat to safety. As to resisting arrest, both the written and video record show Ms. Pardue actively resisted having her arms placed in handcuffs during both arrests. In the case of her 2021 arrest, she also resisted being moved to a police car from her kitchen. For both arrests the arresting officers used minimal force. At most, they bruised Ms. Pardue's arms as they attempted to bring them behind her back while she kept them stiff and pulled away. In both arrests, they also double-cuffed her handcuffs to prevent damage to her wrists. Such force is reasonable and, indeed, was necessary under the circumstances.

Ms. Pardue's last excessive force claim relates to her forcible restraint by Defendants Bilodeau and Brown shortly after her FIT evaluation. This too is assessed under a totality of the circumstances test, and includes "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2021).

Once again, the totality of the circumstances would not support a finding in Ms. Pardue's favor. Ms. Pardue resisted at every step of the way—refusing to remove her medical wires or have them removed, refusing to stand and walk to a cruiser, threatening to throw her shoe, and screaming or spitting at police and security. All in all, there was a

need to use some force to remove Ms. Pardue from the hospital and prevent her from attacking police or security officers. Ms. Pardue again suffered at most bruising on her arms or legs, being put into a spit hood (by hospital staff) and being placed in a transport belt with her hands cuffed to the belt. While demeaning, this use of force was proportionate to Ms. Pardue's resistance and assaultive behavior. Ms. Pardue has thus failed to demonstrate a genuine issue of material fact that Defendants Bilodeau and Brown used excessive force against her.

### 4. Failure to Protect

Ms. Pardue also claims Defendants Bilodeau and Brown violated the Eighth Amendment by failing to provide her adequate medical care.

Inadequate care claims, most often brought by prisoners, require that Ms. Pardue show that (1) Defendants Brown and Bilodeau were "deliberately indifferent" to her health or safety and (2) her inadequate care was "objectively, sufficiently serious." *Leavitt v. Corr. Med. Serv., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (quoting *Burrell v. Hampshire Cnty*, 307 F.3d 1, 8 (1st Cir. 2002)). Even if Ms. Pardue's inadequate care was "serious," which is doubtful here, her claims still fail on the deliberate indifference prong.

Deliberate indifference is a subjective, culpable state of mind: Defendants Brown and Bilodeau must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and they must "also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference is a "narrow band of conduct;" even treatment that would be malpractice under state law may not qualify as deliberate indifference. *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 162 (1st Cir.

2006).  Nor does disagreement on what medical care is appropriate create a constitutional violation.  *Id.*

When Ms. Pardue complained about her wrists hurting, Officer Bilodeau took her to SMHC.  When she told him she had previously been assaulted in the lobby, Officer Bilodeau took her to a separate entrance to avoid that area.  When Ms. Pardue threatened to kill herself, a doctor immediately informed Officer Bilodeau that Ms. Pardue would be fit for jail after a ten-minute evaluation and he deferred to the doctor's opinion.  Given the record, the finder of fact would undoubtedly characterize Officer Bilodeau's treatment of Ms. Pardue as active concern, not deliberate indifference.  Similarly, Sergeant Brown, who arrived well after Ms. Pardue's FIT evaluation, could not have been aware of any facts indicating serious harm awaited Ms. Pardue.  As Officer Bilodeau and Sergeant Brown did not act with deliberate indifference, Ms. Pardue has failed to make out a constitutional violation.

### 5.    State-Created Danger

Ms. Pardue's failure to protect claim may also be read as a state-created danger claim.  Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of" the Fourteenth Amendment's Due Process Clause.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  However, "when the state creates the danger to an individual, an affirmative duty to protect might arise."  *Irish v. Fowler*, 979 F.3d 65, 73 (1st Cir. 2020).  Much like a failure to protect claim, the first prong of the state-created danger test requires that Ms. Pardue show the Defendants "actually knew of a substantial risk of serious harm . . . and disregarded that

risk." *Id.* (quoting *Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004)). As previously discussed, she cannot meet this burden, and as a result she has failed to make out a constitutional violation.

### 6.    Qualified Immunity Standard

In response to Ms. Pardue's constitutional claims, Defendants' raise a qualified immunity defense. Qualified immunity protects law enforcement officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In essence, only those "plainly incompetent or those who knowingly violate the law" are not shielded by qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity itself is a three-part inquiry: (1) do Ms. Pardue's allegations establish a violation of a constitutional right, (2) was that right clearly established at the time of the alleged violation, and (3) would a reasonable officer in the same circumstances understand that the conduct in question violated that right. *Pagán v. Calderón*, 448 F.3d 16, 31 (1st Cir. 2006).

Notwithstanding the First Circuit's recent undermining of qualified immunity under the "akin to" exception to the clearly established constitutional right prong, the Defendants are all entitled to summary judgment based on qualified immunity because their facts are deemed admitted, and Ms. Pardue has failed to establish any violations of her constitutional rights.

### B.    SUPERVISORY LIABILITY

Ms. Pardue's Complaint attempts to hold Chief Andersen and Deputy Chief Small accountable on a theory of supervisory liability. Ms. Pardue alleges that Defendants

Andersen and Small ignored her letters complaining of misconduct and allowed Sanford police to continue violating Ms. Pardue's rights.

At the motion to dismiss stage, I was skeptical that Ms. Pardue had stated a claim against Defendants Andersen and Small.  *See* Order on Defs' Mot. to Dismiss (ECF No. 38) at 5 ("[T]he fact that Pardue believes the police force is out to get her is not enough to state a claim. Nor is it necessarily enough to allege that she sought help from the Chief or Deputy Chief and that help was not forthcoming.").  Nonetheless, I found Ms. Pardue had given enough facts to plausibly state a claim against the supervisory Defendants as they were likely aware of the long-standing police activity at Ms. Pardue's home.

However, for the reasons previously related, none of the arresting officers violated Ms. Pardue's constitutional rights.  Because no officer under Defendants Andersen's or Small's supervision violated Ms. Pardue's rights, she cannot raise a successful claim against them.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If . . . the [subordinate] officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable.").  Accordingly, Defendants Andersen and Small are entitled to summary judgment.

## C.    STATE CLAIMS

Ms. Pardue's Complaint asserts multiple state law tort claims: trespass, intentional infliction of emotional distress, and false arrest.  These claims are governed by the Maine Torts Claim Act ("MTCA"), 14 M.R.S. §§ 8101-8118.  The MTCA mandates that a would-be plaintiff must notify government entities "within 365 days after any claim or cause of action . . . accrues."  *Id.* § 8107(1).  It gives various form requirements for the notice and

24

provides "no claim or action shall be commenced against a governmental entity or employee . . . "unless the foregoing notice provisions are substantially complied with." *Id.* § 8107(4).  Put differently, failing to comply with the notice requirement "bars the suit." *Porter v. Philbrick-Gates*, 745 A.2d 996, 998 (Me. 2004).  The MTCA does provide a carve-out for late notices where "a claimant shows good cause why notice could not have reasonably been filed within the 365-day limit." *Id.* § 8107(1).

As to her September 2021 arrest, the record establishes that Ms. Pardue sent a Notice of Claim to the Sanford Police in December 2022, which is three months past the deadline.  For her 2023 arrest, although she later sent a letter to Chief Andersen complaining of police conduct, Ms. Pardue never sent any other notice that would fulfill the requirements of MTCA section 8107.  Ms. Pardue also does not raise any good cause arguments as to why she filed a late notice in 2022 and has yet to file a notice relating to her claims from her 2023 arrest.  Because Ms. Pardue has failed to comply with the requirements of the MTCA her state claims are barred.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 87) is GRANTED.

**SO ORDERED.**

Dated this 8th day of July, 2025.

/s/ Lance E. Walker
Lance E. Walker
Chief U.S. District Judge